John R. TAMBONE, M.D., Plaintiff,

v.

MEMORIAL HOSPITAL for McHENRY COUNTY, an Illinois corporation, et al., Defendants.

No. 79 C 2012.

United States District Court,
N.D. Illinois, E.D.

March 28, 1986.

David L. Clark, Chicago, Ill., for plaintiff.

Alfred C. Tisdahl, Jr., French, Rogers, Kezelis & Kominiarek, P.C., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

Plaintiff filed a three-count complaint alleging violations of Section One of the Sherman Act, 15 U.S.C. § 1, the Illinois Antitrust Act, and Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983. The Section 1983 claim was dismissed by Judge McMillen on October 26, 1979. Presently before this Court is defendant's motion to dismiss the claim under the Sherman Act and the pendent state antitrust claim.[1]

*Facts*

Plaintiff, Dr. John R. Tambone, is a licensed physician and surgeon who has practiced medicine in Woodstock, Illinois, for more than 30 years. At all times relevant to the complaint, the individual defendants were all affiliated, in various capacities, with either one or both of the corporate defendants—Memorial Hospital and Kishwaukee Valley Medical Group. The gravamen of plaintiff's complaint is that the individual defendants effected a conspiracy to restrain and injure the plaintiff's business by removing the plaintiff from the staff of Memorial Hospital and refusing to grant plaintiff staff privileges upon his subsequent reapplication. The

---

1. Although defendants have titled their motion a motion to dismiss, the motion should be denominated a motion for judgment on the pleadings since the defendants filed an answer in this action more than six years ago. *See,* Fed.R. Civ.P. 12(c), (h)(2). In substance, however, the motion is identical to and subject to the same legal standards as a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). *See,*

5 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1367 (1969). In deciding such a motion, the court must accept all properly pleaded facts as true and all allegations must be construed in the light most favorable to the plaintiff. *Wilson v. Harris Trust & Savings Bank,* 777 F.2d 1246, 1247 (7th Cir.1985). To avoid confusion, the Court will continue to refer to the pending motion as a motion to dismiss.

plaintiff alleges that defendants effected the conspiracy through their positions on the medical staff of the hospital and on the hospital's Executive, Accreditation and Joint Advisory Committee and Credentials and Nominating Committee.

Specifically, Dr. Tambone alleges that in 1974, defendants, through their membership on hospital committees, wrongfully instigated a series of hearings before hospital committees and boards that resulted in the revocation of Dr. Tambone's privileges at Memorial Hospital. In September, 1977, Dr. Tambone submitted an application for certain medical and staff privileges at the hospital. The application was denied by a letter dated March 29, 1978. Dr. Tambone reapplied for limited medical and staff privileges in April, 1978. That application also was denied by a letter dated June 2, 1978. Dr. Tambone protested the denial and requested a hearing. In response, the Hospital sent Dr. Tambone a copy of the minutes of the May 11, 1978 meeting of the hospital's Credentials and Nominating Committee. Those minutes indicate that the Committee found Dr. Tambone "unqualified as to competency and professional standing" and recommended to the hospital's medical staff that his application be rejected. In summary, all of the specific factual allegations supporting Dr. Tambone's Sherman Act cause of action involve the operation of organizations within the structure of Memorial Hospital dealing with staff privileges at the hospital.

*Discussion*

Defendants rely almost exclusively on *Marrese v. Interqual, Inc.,* 748 F.2d 373 (7th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 3501, 87 L.Ed.2d 632 (1985), to support their motion. In *Marrese,* the Seventh Circuit examined the statutory and regulatory structure established by Indiana to regulate the process of peer review in Indiana hospitals. After a close analysis of the relevant statutes and regulations, the court concluded that actions taken by Indiana hospitals solely pursuant to the statutory-created peer review process are exempt, under the state action doctrine, from

attack under the federal antitrust laws. To this Court's knowledge, this is the first court to address the applicability of the state action doctrine to peer review actions by Illinois hospitals since the decision in *Marrese.*

■ Under the state action doctrine, anticompetitive actions by private parties are immune from liability under the antitrust laws if two standards are met. "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980) (quoting *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978)) (quoted in *Marrese,* 748 F.2d at 386); *see also, Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 1727–28, 85 L.Ed.2d 36 (1985).

■ To meet the first prong of the state action test, the policy invoked must be clearly articulated by the state itself. Thus, if the source of the policy is the state legislature, the policy must be clearly embodied in a statute. *Southern Motor Carriers,* 105 S.Ct. at 1730; *Marrese,* 748 F.2d at 386 n. 18. Although the details of how the anticompetitive conduct may be pursued can be left to regulation by state agencies, state agencies acting alone cannot immunize anticompetitive conduct. The intent to condone the challenged conduct must be clearly articulated by the legislature itself. *Southern Motor Carriers,* 105 S.Ct. at 1730.

It is not necessary, however, that the legislature explicitly state that it is endorsing conduct that will have anticompetitive effects. The clear articulation prong of the state action test is met when "it is clear that anticompetitive effects logically would result" from activity authorized by the legislature. *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 1718,

85 L.Ed.2d 24 (1985); *see also, Marrese*, 748 F.2d at 386 n. 18.

In *Marrese*, the court found that "(t)he State of Indiana has developed and enacted a comprehensive statutory scheme of medical peer review to protect consumer welfare." 748 F.2d at 387. The Indiana statutory scheme analyzed in *Marrese* places supreme authority over the appointment of members of a hospital's medical staff in the hospital's governing board. The medical staff, in turn, is responsible for reviewing professional practices and patient care.

To implement this review process, the statutory scheme provides that hospitals establish a peer review committee that shall have "the responsibility of evaluation of qualifications of professional health care providers, or of patient care rendered by professional health care providers, or of the merits of a complaint against a professional health care provider that includes a determination or recommendation concerning the complaint." Ind.Code § 34–4–12.6–1. The peer review committee must be organized, *inter alia,* "by the professional staff of a hospital" and a "majority of the members [must be] professional health care providers holding licenses in the stated profession of the committee." *Id.*

748 F.2d at 388.

The court concluded that

(t)he State of Indiana has "clearly articulated and affirmatively expressed as state policy" that hospital medical staffs are to form peer review committees and that such committees are to review the quality and necessity of the care provided patients, to evaluate the qualifications of staff members, and review the merits of any recommendation against a staff member. Ind.Code §§ 16–10–1–6.5, 34–4–12.6–1. As a necessary and reasonable consequence of this state mandated medical peer review process, hospital staff members must review the medical treatments, diagnostic procedures, and surgical procedures of competing staff members and, when required, recommend the revocation of staff privileges. Thus, the

defendants' conduct, as members of or consultants to [the hospital's peer review committees], in reviewing Dr. Marrese's surgical procedures and recommending that his staff privileges be revoked, satisfies the first element of the [state action] test.

748 F.2d 388–89 (citation omitted).

The statutory scheme underlying peer review in hospitals in Illinois differs from that found in Indiana. Pursuant to Ill.Ann. Stat. ch. 111½, § 151(c) (Smith-Hurd pocket part 1985), the Director of the Department of Public Health of the State of Illinois "shall prescribe rules, regulations, standards, and statements of policy needed to implement, interpret, or make specific the provisions and purposes" of the Hospital Licensing Act, Ill.Ann.Stat. ch. 111½, § 142 *et seq.* Rules, regulations or standards concerning the operation of hospitals licensed under the Act must be approved by the Hospital Licensing Board created under Section 151(a).

The purpose of the Act, as stated by the legislature, is as follows:

The purpose of this Act is to provide for the better protection of the public health through the development, establishment, and enforcement of standards (1) for the care of individuals in hospitals, (2) for the construction, maintenance, and operation of hospitals which, in light of advancing knowledge, will promote safe and adequate treatment of such individuals in hospital, and (3) that will have regard to the necessity of determining that a person establishing a hospital have the qualifications, background, character and financial resources to adequately provide a proper standard of hospital service for the community.

Ill.Ann.Stat. ch. 111½, § 143 (Smith-Hurd 1977).

Thus, the Act delegates broad authority to the Director of the Department of Public Health to regulate, with the approval of the Hospital Licensing Board, the operation of Illinois hospitals. Pursuant to that authority, the Director of the Department of Public Health has promulgated regulations,

entitled the Illinois Hospital Licensing Requirements, to implement the provisions and purposes of the Act.

At all times relevant, the Requirements mandated that

(f)or each hospital there shall be a governing authority, hereinafter called the board, responsible for its organization, management, control and operation, including appointment of the medical staff.

Rule 2–1.1. The medical staff is defined as:

... an organized body composed of individuals granted the privilege by the governing authority of the hospital to practice in the hospital. *Any of the following who are granted practice privileges by a hospital shall be placed on the hospital's Medical Staff:* persons who are graduates of a college or school approved or recognized by the Illinois Department of Registration and Education, and who are currently licensed by the Department as a Doctor of Medicine, M.D.; Doctor of Osteopathy, D.O.; Doctor of Dental Surgery, D.D.S.; or Doctor of Podiatric Medicine, D.P.M.

Rule 1–5.1(k) (emphasis in original). Rule 2–1.6 clearly states that the board has the ultimate responsibility of ensuring and reviewing the competency of the medical staff:

The board shall be responsible for the maintenance of proper standards of professional work in the hospital and shall require that the medical staff function in conformity with reasonable standards of competency. Clinical audits shall be performed by the medical staff and reviewed by a committee of the governing authority and the medical staff.

Rule 3–1.1 further provides that the medical staff "shall be organized in accordance with written bylaws, rules and regulations" approved by the board. Those bylaws must, in relevant part, provide:

(a) for written procedures for accepting and processing applications for medical staff membership;

(b) for eligibility for staff membership, whether the practitioners are or are not currently members of the medical staff;

(c) for a policy that specifies a procedure for processing applications for staff privileges and guarantees due process and fair hearing for each such applicant;

. . . . .

(f) for committees as are warranted to assure the responsibility for such functions as pharmacy and therapeutics, infection control, utilization review, patient care evaluation, and the maintenance of complete medical records;

(g) for determination of qualifications and privileges;

. . . . .

(i) for review and analysis of the clinical experience of the hospital at regular intervals—the medical records of patients to be the basis for such review and analysis.

Finally, Rule 3–1.2(b) again reiterates that the active medical staff is responsible for the

organization of the medical staff, including adoption of rules and regulations for its government (which require the approval of the governing body), election of its officers or recommendations to the governing body for appointment of the officers, and recommendations to the governing body upon all appointments to the staff and grants of hospital privileges.

■ These regulations clearly indicate that peer review committees are a functional necessity if Illinois hospitals are to comply with the regulations issued by the Director of the Illinois Department of Public Health. However, the statutory basis for these regulations is the broad grant of regulatory authority found in Ill.Stat.Ann. ch. 111½, § 151(c). That grant of rulemaking authority does not, in any way, specifically address the peer review process. Instead, the Director is empowered to regulate, for the benefit of Illinois citizens, the

operation of Illinois hospitals through virtually any regulatory system that the Director, with the concurrence of the Hospital Licensing Board, finds will implement the provisions and purposes of the Hospital Licensing Act. Such a broad, amorphous grant of authority is insufficient to meet the clear articulation prong of the state action doctrine. *See, Hallie,* 105 S.Ct. at 1718–19 (comparing the statutory provisions at issue in *Hallie* with those at issue in *Community Communications Company v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982)).

■ However, Ill.Stat.Ann. ch. 111, § 4406 (Smith-Hurd 1978) provides another basis for meeting the clear articulation test. That section states:

> While serving upon any Medical Utilization Committee, Medical Review Committee, Patient Care Audit Committee, Medical Care Evaluation Committee, Quality Review Committee, Credential Committee, Peer Review Committee, or any other committee whose purpose, directly or indirectly, is internal quality control or medical study to reduce morbidity or mortality, or for improving patient care within a hospital duly licensed under the Hospital Licensing Act, or the improving or benefiting of patient care and treatment whether within a hospital or not, or for the purpose of professional discipline, any person serving on such committee, and any person providing service to such committees shall not be liable for civil damages as a result of his acts, omissions, decisions, or any other

conduct in connection with his duties on such committees, except those involving willful or wanton misconduct.

A statutory grant of good faith immunity from civil liability for service on a peer review committee is a clear expression of the Illinois legislature's decision that, as a matter of state policy, participation in the peer review process is to be encouraged. *Cf., Marrese,* 748 F.2d at 391 (noting a similar good faith immunity statute in Indiana). Such an expression is sufficient to meet the clear articulation prong of the state action doctrine.[2]

However, to meet both prongs of the doctrine, the defendants still must show that the policy at issue was actively supervised by the state. In *Marrese,* the court noted that the State of Indiana, during the time at issue, supervised the peer review process in two ways. First, the Medical Licensing Board, which supervises the medical profession in the state through the biennial registration and licensure of all physicians, reviewed the communications, records and determinations of hospital peer review committees whenever a committee deemed such review necessary for recommended disciplinary action. In addition, the Hospital Licensing Council, a state agency, had and continues to have the power to review the records of peer review committees as part of its duty to periodically review the operation of every hospital in Indiana. *Marrese,* 748 F.2d at 389–90.

The oversight system *currently* in operation in Illinois is similar, but not identical, to that now found in Indiana. Pursuant to

**2.** In *Quinn v. Kent General Hospital, Inc.,* 617 F.Supp. 1226 (D.Del.1985), the defendants, relying heavily on *Marrese,* argued that a similar good faith immunity statute in the Delaware Code met the clear articulation prong of the state action doctrine. The court, although apparently conceding that, under *Marrese,* the immunity statute would be sufficient, nonetheless rejected the argument because of its disagreement with *Marrese* itself. This Court is, of course, bound by *Marrese.* In any event, the *Quinn* court's objection to *Marrese* —based upon its belief that the clear articulation test requires a statutory indication that the legislature intended to displace competition and not merely promote the peer review process—ap-

pears ill-founded. First, as the *Quinn* court itself noted, the Supreme Court in *Hallie* rejected this position. *See,* text *supra* at 510; *Hallie,* 105 S.Ct. at 1718. Second, one can reasonably assume that the legislature's decision to pass an immunity statute was based upon concern that the peer review process would spawn, and hence possibly be thwarted by, lawsuits premised on theories of tortious interference with commercial relations similar to the suit presently before this Court. Thus, to suggest that passage of an immunity statute does not suggest that the legislature intended to affect competition in the medical marketplace does not ring true.

**514**

the Hospital Licensing Act, the Department of Public Health can make "such inspections and investigations as it deems necessary." Ill. Stat.Ann. ch. 111½, § 150 (Smith-Hurd 1977). Pursuant to Rule 1-3.3 of the Illinois Hospital Licensing Requirements, Illinois hospitals are required to grant inspectors for the Department access to all hospital records, presumably including peer review records.[3]

Allegations that would constitute grounds for the suspension or revocation of a license issued pursuant to the Medical Practice Act, Ill.Stat.Ann. ch. 111, § 4401, *et seq.* (Smith-Hurd 1978), are investigated by the Illinois State Medical Disciplinary Board. Ill.Stat.Ann. ch. 111, § 4440 (Smith-Hurd pocket part 1985). Since January 1, 1983, Illinois hospitals have been obligated to report to the Board any termination or restriction of a person's clinical privileges that is based upon a final determination, made according to a hospital's bylaws, that the individual has committed an act that may constitute unprofessional conduct related directly to patient care or is mentally or physically disabled in a manner that may endanger patients. Ill.Ann.Stat. ch. 111, § 4437(a)(1) (Smith-Hurd pocket

part 1985).[4] Evaluations under the peer review process are clearly covered by this requirement.

■ However, *prior to 1983*, this Court is unaware of any statute or regulation that mandated either the transmission of peer review determinations to a state agency or the review of peer review reports by a state agency. Although the Department of Public Health, under Ill.Stat.Ann. ch. 111½, § 150 (Smith-Hurd 1977) and Rule 1-3.3, had access to peer review materials, inspectors for the Department were not obligated to inspect peer review materials. In fact, on-site inspections by the Department in any form were and still are discretionary. Similarly, although hospitals and individuals were clearly able to report suspected professional misconduct to the Illinois State Medical Disciplinary Board prior to 1983,[5] reports to the Board of hospital peer review determinations were not mandatory until Ill.Stat.Ann. ch. 111, § 4437 became effective in 1983. Thus, to the knowledge of this Court, prior to 1983, regular, organized supervision of the peer review process by an Illinois agency did not exist.[6] Given this clear lack of active su-

---

**3.** Rule 1-3.3 states:

All hospitals to which these requirements apply shall be subject to inspection by properly identified personnel of the Department, or by such other persons, properly identified, including full-time local health officers, as the Department may designate. The licensee or person representing the licensee in the hospital shall provide the representative of the Department with any hospital records, assisting him in inspecting the premises, and obtaining information required by the Act or Requirements.

**4.** Ill.Stat.Ann. ch. 111, § 4437(a)(1) (Smith-Hurd pocket part 1985) states, in relevant part:

The chief administrator or executive officer of any health care institution licensed by the Illinois Department of Public Health shall report to the Board when any person's clinical privileges are terminated or are restricted based on a final determination, in accordance with that institution's by-laws or rules and regulations, that a person has either committed an act or acts which may constitute unprofessional conduct related directly to patient care, and not of an administrative nature, or that a person may be mentally or physically disabled in such a manner as to

endanger patients under that person's care. Such officer also shall report if a person accepts voluntary termination or restriction of clinical privileges in lieu of formal action based upon unprofessional conduct related directly to patient care and not of an administrative nature, or in lieu of formal action seeking to determine whether a person may be mentally or physically disabled in such a manner as to endanger patients under that person's care.

Subsection (c) of Section 4437 grants good faith immunity to individuals or organizations making reports to the Board pursuant to subsection (a). The reporting requirements of Section 4437 are similar to, but not as sweeping as, those found in Ind. Code § 16–10–1–6.5, quoted in *Marrese*, 748 F.2d at 389 n. 22.

**5.** *Cf.*, Ill.Stat.Ann. ch. 111, § 4452 (Smith-Hurd 1978), granting good faith immunity to physicians and organizations reporting possible violations of ch. 111, § 4433.

**6.** According to one commentator, Ill.Stat.Ann. ch. 111, § 4437 was designed "to link up discipline of physicians at the institutional level with licensure discipline at the state level." Culli-

pervision of the peer review process, the Court must conclude that the second prong of the state action doctrine can not be met for actions taken during the period at issue in this action. *Cf., Quinn v. Kent General Hospital, Inc.,* 617 F.Supp. 1226, 1240 (D. Del. 1985) (Active supervision of peer review actions by the State of Delaware not present).

 The Court is aware that there is substantial similarity between the Indiana regulatory system at issue in *Marrese* and the Illinois regulatory system operating during the period at issue in this action concerning the supervision of the peer review process. However, important differences do exist. First, although transmission of all adverse peer review determinations to the Indiana Medical Licensing Board did not become mandatory until 1983 (*see, Marrese,* 748 F.2d at 389 n. 22), the predecessor statute quoted at 748 F.2d at

389 clearly contemplated the routine forwarding of peer review materials to appropriate registration and licensure boards for action by the state. No such statute or regulation, permissive or mandatory, appears to have existed in Illinois prior to the enactment of Ill.Stat.Ann. ch. 111, § 4437. Second, review of Indiana hospitals by representatives of the State Board of Health was and still is required on a periodic basis. Inspections by the Illinois Department of Health were and still are discretionary. Thus, although neither state apparently requires that its public health units specifically review peer review records, it is less likely that such records would be reviewed in Illinois. Viewing the Illinois statutory and regulatory scheme as a whole and as it existed at the time of the events complained of in this action, this Court cannot find that peer review was actively supervised by the State of Illinois.[7]

nane, *New Rules for an Old Problem—The Problem Physician,* 71 Ill.B.J. 426 (1983). The commentator further states that passage of the statute was spurred by a series of articles published in the *Chicago Tribune,* one of which indicated that Illinois ranked 45th among the 50 states in the number of disciplinary actions per physician. *Id.* at 426 and n. 4. This article clearly suggests that, prior to the amendatory legislation, peer review reports were generally not being relayed to the Illinois State Medical Disciplinary Board and that this legislation was designed to remedy that problem.

7. Two arguments of the plaintiff upon which this Court has not relied in reaching its decision nevertheless merit comment. First, plaintiff notes that the complaint names a corporate defendant and several individual defendants who were not involved in the hospital peer review process. These parties are nonetheless alleged to have been party to the alleged conspiracy to revoke Dr. Tambone's privileges to practice at the hospital and ensure that those privileges not be reinstated. Plaintiff argues that, even if the hospital and the individual defendants who are members of the hospital's peer review structure are dismissed pursuant to the state action exemption, the Sherman Act claim against the other defendants would still remain.

This Court rejects that argument. As noted in the text, *supra* at 510, all of Dr. Tambone's factual allegations involve the operation of organizations within the structure of Memorial Hospital dealing with staff privileges at the hospital. In other words, all of his allegations involve the peer review process. As the Supreme Court

noted in *Southern Motor Carriers,* "(t)he success of an antitrust action should depend upon the nature of the activity challenged...." 105 S.Ct. at 1728. Without adding any additional factual allegations, Dr. Tambone's complaint states in purely conclusory terms that other individuals and a rival professional corporation were members of a conspiracy to subvert the peer review process. If such pleading were sufficient to avoid total dismissal of a Sherman Act claim, plaintiffs would be able to destroy the effectiveness of the state action doctrine simply by adding a party defendant who was not directly involved in the actual conduct alleged. *Cf., Hoover v. Ronwin,* 466 U.S. 558, 104 S.Ct. 1989, 2001, 80 L.Ed.2d 590 (1984) (allowing "plaintiffs to look behind the action of state sovereigns and base their claims on perceived conspiracies to restrain trade among the committees, commissions, or others who necessarily must advise the sovereign [would] emasculate the [state action] dcotrine."). Such a result is clearly unwarranted and unwise.

Plaintiff has also argued that Judge McMillen's dismissal of the plaintiff's Section 1983 action on the basis that the defendant's actions were not committed under color of state law precludes a finding by this Court that the state action doctrine immunizes defendants from liability under the antitrust laws. This argument fails for two reasons. First, regardless of Judge McMillen's holding concerning the presence of state action to support the Section 1983 claim, this Court's holding on the motion currently before it must be, and is, based upon an examination of the relevant Illinois statutes and regu-

516

However, the issue is a close one, and reasonable minds could differ concerning the application of *Marrese* to the statutes and regulations affecting peer review in Illinois hospitals. As this issue is certain to reoccur with regularity in the federal district courts in Illinois, and as a decision reversing this Court would dispose of the plaintiff's sole remaining federal cause of action, judicial economy would be well served by guidance from the Seventh Circuit at this time. Therefore, this Court, on its own motion, will certify this order for immediate appeal pursuant to 28 U.S.C. § 1292(b).

*Conclusion*

For the peer review actions involved in this case to fall within the state action exemption from the antitrust laws, the defendant must show that peer review was pursuant to a clearly expressed state policy and was actively supervised by the state. The defendant has failed to show active supervision of the actions complained of herein. The defendant's motion to dismiss is therefore denied. In addition, pursuant to 28 U.S.C. § 1292(b), the Court finds that this order clearly involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from this order may materially advance the ultimate termination of this litigation.

lations in light of the case law construing the state action exemption to the antitrust laws. The validity of Judge McMillen's holding is not before this Court. Second, as the court in

*Marrese* noted, the elements required to establish state action under Section 1983 differ from those required to meet the state action immunity doctrine. *Marrese,* 748 F.2d at 395 n. 25.